UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|   |   |   |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| DIVA JEWELRY DESIGN, INC., | ) | Case No. 06-12256 (REG) |
|  | ) |  |
| Debtor. | ) |  |

_____)


DECISION ON APPLICATION TO RETAIN
COUNSEL TO THE TRUSTEE


APPEARANCES:

DIANA G. ADAMS
ACTING UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004
By:  Lisa L. Lambert, Esq., Trial Attorney

Leo Fox, Esq.
Proposed Counsel for the Chapter 7 Trustee
630 Third Avenue, 18th Floor
New York, NY  10017


BEFORE:     ROBERT E. GERBER
                    UNITED STATES BANKRUPTCY JUDGE

        In this case under chapter 7 of the Bankruptcy Code, the newly elected chapter 7

trustee for the Estate, Matthew C. Harrison (the "Trustee"), has applied to employ

attorney Leo Fox, Esq. under section 327(a) of the Code.  The United States Trustee

("UST") opposes the application.  Insofar as the Court can determine, the UST does not

contend that Mr. Fox is forbidden from representing the Trustee because Mr. Fox *will in

the future represent* estate creditors with respect to the matters in this case.   But she

contends that Mr. Fox may not represent the Trustee because (1) *earlier in this case* Mr.

1

Fox represented creditors who sought and obtained the election of the Trustee who would later hire Mr. Fox, (2) Mr. Fox would profit from the work he would thereafter do for the Estate, and (3) Mr. Fox might be required to prosecute preference claims, or defend consignment demands, brought against or by members of the client group he represented. As a result, the UST contends, Mr. Fox is not disinterested, represents interests adverse to the estate and has an actual conflict of interest.[1]  She also at least seemingly argues that retention of Mr. Fox should be disapproved on nonstatutory grounds.

Allegations of adverse interest and inappropriate conduct are serious matters.  The integrity, and appearance of integrity, of the bankruptcy system require conduct beyond reproach,[2] and when allegations of adverse interest or inappropriate conduct are established, bankruptcy courts must take appropriate action.  By the same token, allegations of such are serious matters for the targets of such allegations as well, and the targets of such allegations deserve the opportunity to defend themselves.  Thus it was essential for both sides to make appropriate factual showings, in depth, and the Court held an evidentiary hearing.

Upon consideration of the evidentiary showing that each side made (and, in particular, that the UST did not make), the Court concludes that the application passes muster under section 327(a) and the applicable caselaw.  Plainly a showing of a lack of disinterestedness, adverse interest, or improper conduct would make a proposed retention of a section 327(a) professional impermissible.  But such has not been shown here.

---

[1]    She further contends that this was part of a pattern of conduct on the part of Mr. Fox, as evidenced by another chapter 7 case in this district, before Judge Hardin in White Plains, where creditors represented by Mr. Fox also sought the election of Mr. Harrison as a chapter 7 trustee, and where Mr. Harrison also sought to retain Mr. Fox.

[2]    *See In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

The following are the Court's findings of fact and conclusions of law in connection with its determination.

## Facts

Diva Jewelry Design, Inc. (the "Debtor"), a seller of jewelry and precious stones, filed a chapter 7 petition in September 2006. An interim trustee was appointed promptly thereafter. From early on in the case, creditor representatives expressed concerns that Debtor's assets were unaccounted for, and that the Debtor might have engaged in misconduct. A group of creditors holding approximately $2 million out of the approximately $5.5 million in claims in this case retained a non-bankruptcy litigation attorney, Cindy Molloy, Esq., to press their interests in investigating an apparent disappearance of Estate's assets and in achieving recovery on their claims. With her creditor group (and/or Ms. Molloy herself) dissatisfied with a perceived lack of aggressiveness on the part of the interim trustee in pursuing the creditor concerns, Ms. Molloy retained Mr. Fox, a bankruptcy attorney, as counsel to her firm, and Mr. Fox pursued, on the creditors' behalf, Fed. R. Bankr. P. 2004 examinations in efforts, *inter alia*, to investigate how it was that there were so few assets in the Estate (when creditors had shipped the Debtor over $5 million in inventory),[3] and to explore asset recovery opportunities. Mr. Fox also was retained to, and did, attend the 341 meeting and request a creditors' trustee election for a permanent chapter 7 trustee; consult with Ms. Molloy's firm regarding the election process; and file the papers in accordance with bankruptcy court procedures.[4] While Mr. Fox was, strictly speaking, "of counsel" to Ms. Molloy, he

---

[3]     *See* Hrg. Tr. 21.

[4]     Molloy Decl. of Feb. 15, 2007 at ¶ 3.

3

from time to time referred to himself as the creditors' counsel,[5] and at the evidentiary

hearing on this matter did not dispute that his representation of Ms. Molloy on an "of

counsel" basis also constituted representation of the creditors.[6]  In any event, the Court so

finds; though it was Ms. Molloy who hired Mr. Fox and with whom Mr. Fox principally

dealt, he must be found to have represented the creditors themselves.[7]

Mr. Fox introduced creditors (or at least members of the Molloy-Fox Creditor

Group) to Matthew C. Harrison, Jr.,[8] who was then elected as Trustee—unanimously.

Mr. Fox moved to certify the Trustee's election, and after a hearing on the matter, the

Court appointed Mr. Harrison as Trustee, in accordance with the creditors' vote.  The

Trustee now seeks to appoint Mr. Fox as counsel for the Trustee.

At the evidentiary hearing on this application, a trial attorney for the UST

examined Mr. Fox as a witness on an adverse direct examination.  Mr. Fox answered the

UST's questions without objection, and the Court finds his testimony to have been

credible.  No evidence was elicited that there was any promise, agreement or "quid quo

pro" in connection with Mr. Fox's introduction or recommendation of Mr. Harrison as a

prospective permanent trustee, or with respect to Mr. Harrison's later retention of Mr.

Fox as the Trustee's counsel.  Nor did the UST seek to elicit evidence of such.  However,

it is reasonable to infer, and the Court finds, notwithstanding the UST's failure to elicit

more facts, that Mr. Harrison and Mr. Fox had and still have a familiarity and working

---

[5]      *See* Hrg. Tr. 20.

[6]      *See* Hrg. Tr. 8.

[7]      From time to time, however, to better describe the events in question, the Court will be more
descriptive, and will speak, as the circumstances require, of the representation by Mr. Fox of the
"Molloy-Fox Creditor Group," on the one hand, or, alternatively (and to the extent applicable) of
individual creditors (with personal contact with those creditors), on the other.

[8]      *See* Hrg. Tr. 23.

4

relationship,[9] causing Mr. Fox to recommend the election of Mr. Harrison, and causing

Mr. Harrison to wish to retain Mr. Fox—though, perhaps significantly for this dispute,

there was no evidence of any agreement or understanding between them.  And it is also

reasonable to infer, and the Court does infer, that Mr. Fox believed that if Mr. Harrison

were elected, there was a high probability that Mr. Harrison would seek to retain Mr. Fox

as Trustee's counsel.[10]  The Court listened with care to the UST questioning for facts that

might establish some kind of unstated understanding or agreement beyond that, but none

were forthcoming.

There was no evidence of any payment passing between Mr. Harrison or Mr. Fox,

in either direction.  It is reasonable to infer, and the Court does infer, that Mr. Harrison

knew that if he were elected as chapter 7 trustee, he would be entitled to earn the trustee

commissions that are authorized under law, and that Mr. Fox knew that if he were

appointed as counsel, he would be entitled to earn payment for services he provided—in

each case to the extent the Estate could afford them.[11]  But there was no evidence of any

---

[9]     Mr. Fox stated:

> There is nothing wrong with attorney and client who get
> along, who have a working relationship, to be retained to
> represent—for the one to represent the other and to be retained
> in a number of different cases.  That is nothing more than a—
> it signifies that they have a working relationship and they
> know each other and they can operate.

Hrg. Tr. 18.  It is true, as Mr. Fox argued, that chapter 7 trustees in this district, if not also
elsewhere, frequently retain as their counsel particular firms, either regularly or with greater
frequency than they engage others.  And indeed, when they are lawyers they frequently retain
themselves or their own firms.  Based on its personal observation, and cases before it of which it
can take judicial notice, the Court so finds.

[10]    *See* Hrg. Tr. 18 ("I've been, you know, probably one of the likely candidates to represent Mr.
Harrison….")

[11]    As the testimony went:

> At the present time, there's almost no assets in the estate.
>
> …

consideration or arguable consideration running in favor of either of them other than to the extent to which "consideration" might be deemed to exist as a consequence of the opportunity to work for the Estate and thereby receive compensation authorized under law.

Mr. Fox will stop representing Ms. Molloy and her creditors after he is retained as the attorney for the Trustee.[12]  While the Court has found that Mr. Fox represented the Molloy-Fox Creditor Group (a group of approximately 15 creditors, with an aggregate of approximately $2 million in claims),[13] it further finds that Mr. Fox had no "one-on-one" relationship with any of the creditors,[14] and never met any of them until about the time of the section 341 meeting.[15]  Mr. Fox discussed the concept of preference recoveries with members of the Molloy-Fox Creditor Group.  But Mr. Fox did not have any discussions with any of them in terms of what their personal exposure would be, nor did he give any of them advice as to any preference claims against any of them.[16]

---

> And so we have an estate where there's a lot of claims, there's a lot of potential litigation here, and where it is, I think, the hope of the estate and the creditors that the existence of the so-called claims against the debtor's estate might ultimately result in some real recovery to creditors because there's just simply nothing else there at this particular point in time, which is why I believe Mr. Harrison considered retaining me in that connection.

Hrg. Tr. 17.  Thus, in the present state of the case, that the Estate could afford to pay material commissions to Mr. Harrison, or material compensation to Mr. Fox, is not clear.  The Estate's ability to pay its administrative expenses, much less to make payments to creditors, may turn on its ability to recover secreted assets or to recover on avoidance actions.

[12]   Fox Aff. of Jan. 30, 2007 at ¶ 4.  Mr. Fox also affirmed that he had no financial interest in any of the creditors or their interests in this case.  Fox Aff. of Feb. 20, 2007 at ¶ 1.

[13]   *See* Hrg. Tr. 20.

[14]   I*d.* at 32.

[15]   *Id.*

[16]   *Id.*

The Court further finds that Ms. Molloy did not share any confidential information with Mr. Fox.[17]  While Ms. Molloy and Mr. Fox did discuss fraudulent conveyance claims against persons or entities *other than her clients*,[18] Ms. Molloy did not discuss with Mr. Fox any preference, fraudulent conveyance, or other claims that might be brought against any of the members of the Molloy-Fox Creditor Group, other than discussing the concept that trustees bring such actions as are necessary.[19]  Similarly, while there was discussion between Mr. Fox, Ms. Molloy, and perhaps members of the Molloy-Fox Creditor Group as to what reclamation claims *are*, Ms. Molloy did not discuss with Mr. Fox any particular facts relevant to the validity or invalidity of any reclamation claim against any of the Molloy-Fox clients.[20]

The Court further finds that Mr. Fox was not told anything by any member of the Molloy-Fox Creditor Group that was confidential, with respect to litigation that the Estate might bring against any of such creditor clients, or that any of them might bring against

---

[17]    *See id.* at 33.

[18]    Mr. Fox testified, in response to Rule 614 questioning by the Court:

> Q.       Did you discuss with Ms. Molloy the subject matter of any fraudulent conveyance claims against any persons or entities other than her clients, other than the debtor itself , or the debtor's principals?
>
> A.       Yes.  But these were not claims against her clients.
>
> Q.       Clarify what you mean by that, please.
>
> A.       One of the things that was discussed was whether there might exist claims against third parties for fraudulent transactions or transfers of the assets of the estate.
>
> Q.       Other than her clients?
>
> A.       Yes.

Hrg. Tr. 35-36.

[19]    *See id.* at 34-35, 36.

[20]    *See id.* at 36.

the Estate, regarding consignments, preferences, or otherwise.  Mr. Fox denied receiving

any such information, and there was no evidence to the contrary.

The Court further finds that Mr. Fox represented judgment creditors who filed an

involuntary petition under the Code against another debtor, David A. Garfinkel, as to

whom an order for relief was entered in a separate chapter 11 case now before Judge

Hardin in White Plains.[21]  On behalf of his clients in *Garfinkel*, Mr. Fox had engaged in

Rule 2004 discovery with respect to creditor claims that the debtor Garfinkel, a

stockbroker, had secreted his assets.  Mr. Fox introduced the creditors he represented to

Mr. Harrison, and in an election, they voted for Mr. Harrison as the permanent chapter 7

trustee in that case.[22]  Mr. Harrison was so elected and appointed as chapter 7 trustee in

that case, and thereafter Mr. Harrison sought to retain Mr. Fox as his counsel.  A relative

of the debtor and the debtor in that case, whose affairs were the subject of the creditors'

Rule 2004 discovery, opposed Mr. Harrison's application to retain Mr. Fox,[23] and the

UST supported the objection.[24]

This Court takes judicial notice of the fact that Judge Hardin declined to authorize

Mr. Fox's retention, and the reasons that informed Judge Hardin's determination, which,

as discussed above and below, were not shown here.  Though this Court cannot rule out

the possibility that if the UST had tried to do so, she might have introduced evidence in

this Court of the character of the evidence that troubled Judge Hardin, the Court notes a

failure of proof in this regard.  The UST did not introduce any further evidence as to facts

---

[21]    *In re David A. Garfinkel*, case No. 06-22470.

[22]    *See id.* at 38.

[23]    *See id.* at 41.

[24]    *See id.*

in *Garfinkel* that might be relevant here.  Nor, in the post-hearing briefing authorized by this Court (at the UST's request), did the UST seek to invoke collateral estoppel or otherwise ask this Court to find facts based on factual findings by Judge Hardin.

Due to the similarities, in some respects, and differences, in others, between this case and the Second Circuit's decision in *Bank Brussels Lambert v. Coan (In re AroChem Corp.),*[25] the Court makes certain supplemental findings.  Here the proposed retention is for a general counsel for the Trustee, rather than a special counsel.  But here, as there, the Estate's predominant interest, at least at this juncture, is a recovery from third parties— here, the recovery of Estate assets that may have been secreted or transferred abroad— rather than recovery of preferences from vendor creditors of the debtors.  In connection with that predominant interest, the Estate, the Trustee, the creditors in the Molloy-Fox Creditor Group, and other creditors have a total congruence of interest.  The Estate will materially benefit if the Trustee can retain a counsel that has a head start in pursuing such claims.  So far as the record reflects, the creditors in the Molloy-Fox Creditor Group do not have separate actions against prospective targets of litigation that might be brought by the Estate which would put them in competition with the Estate in sharing a limited pot, or cause them to take positions in any such litigation that would be contrary to positions that the Estate might take.  Mr. Fox did not represent either the Molloy-Fox Creditor Group, or any member of that group, with respect to any litigation the Estate might bring against any of them, nor would he do so in the future.

---

[25]        176 F.3d 610 (2d Cir. 1999) (*AroChem*).

Discussion

I.

Under section 327(a) of the Code, the trustee of a bankruptcy estate may, subject to bankruptcy court approval, employ professionals "to represent or assist the trustee in carrying out the trustee's duties" under the Code.  Section 327(a) of the Code provides:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

Therefore, a bankruptcy judge must examine, with respect to the retention of a professional person proposed to assist a trustee generally (as opposed to a special counsel, whose appointment is governed by section 327(e)), whether the professional (a) is "disinterested" and (b) holds or represents an interest "adverse to the estate."

Section 101(14) sets forth the requirements for a finding that a person is "disinterested."[26]  Its first two subsections are not argued to be applicable here, but its third prohibits interests that are "materially adverse" to the estate or to any class of creditors.  Neither "materially" nor "adverse" is defined in section 101(14), or elsewhere,

---

[26]    It provides:

> (14) The term "disinterested person" means a person that—
>
> > (A) is not a creditor, an equity security holder, or an insider;
> >
> > (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> >
> > (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

10

however, nor are standards articulated in the Code for making determinations with respect to such matters.

Section 327(a) imposes a second requirement that the professional's interests not be "adverse to the estate"—a requirement similar, in many respects, to the third prong of section 101(14)—though not accompanied by section 101(14)'s materiality requirement. But subsection (a) is not the only subsection of section 327 that is on point. Section 327(c) of the Code provides that a professional is not disqualified from employment by the trustee solely because of the professional's representation of a creditor.[27] Section 327(c) provides in full:

> (c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

Thus, section 327(c) does not eliminate the basic requirements of section 327(a) that the professional be disinterested and not hold or represent an interest adverse to the estate. By the same token, section 327(c) expresses the recognition that a prospective professional for a trustee may, fully consistent with the Code, have represented, or even continue to represent, one or more creditors. Section 327(c) requires, instead, once more by its express terms and plain language, inquiry into whether there is an *actual conflict of interest*.

---

[27]     To the Court's surprise, the UST's initial brief in opposition to this retention did not cite, much less quote or discuss the significance of, section 327(c). The UST's supplemental brief quoted it, without discussion beyond a quotation of what it says. As is apparent from the discussion above and below, analysis of the issues on this application requires more than minimal consideration of section 327(c), and, in addition, of circumstances that could reasonably be expected to exist in any case where section 327(c) is applicable.

Then, section 105(a) of the Code provides:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

It might plausibly be argued that section 105(a) provides a basis for the Court's action to deny approval for an attorney's retention for improprieties not otherwise addressed under the Code—a position that might be buttressed by elements of the recent decision of the Supreme Court in *Marrama* v. *Citizens Bank of Massachusetts*.[28] But the UST does not argue section 105(a) as a basis for denial here.

## II.

As noted above, the UST argues that (1) Mr. Fox is not disinterested; (2) he represents or has represented interests adverse to the estate; (3) his representation of creditors in this case would create an actual conflict with his potential broad duties as a 'general' counsel to the Trustee; and (4) his conduct was violative of the "spirit" of Fed. R. Bankr. P. 2006. The Court considers those contentions in turn.

### A. Disinterestedness

The UST first argues that Mr. Fox is not "disinterested." As the threshold discussion of the statute above makes clear, this is not the real issue here. The "disinterested" requirement, looking to the nonexistence of interests that are "materially

---

[28]    --- U.S. ---, 127 S.Ct. 1105, 1112 (2007) ("the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in §105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.")

adverse" to the estate or to any class of creditors, is subsumed, under the facts here,

within the requirements of section 327(a) itself, requiring the absence of interests adverse

to the estate.[29]  In fact, by adding a requirement that any adverse interest be "materially"

adverse, section 101(14) imposes a requirement that is more forgiving of adverse

interests than section 327(a) itself is.

*B. Adverse interest*

The Court then turns to the more important issue—the existence or nonexistence

of an adverse interest.  As noted above, the statutory provisions tell us that representation

of creditors by itself is insufficient to warrant denial of retention, and that we must

examine, instead, whether there is an "actual conflict of interest."  Also as noted above,

the Code lacks express standards for determining whether such a conflict exists.  Thus the

Court turns to the caselaw in this area, factual examination, and common sense.[30]

Critical to the Court's analysis in this regard is the Second Circuit's decision in

*AroChem.*[31]  The Circuit there approved a trustee's retention of an attorney who had been

acting as counsel for an individual creditor in bringing his own parallel litigation against

the objectors, and against whom the *AroChem* estate might have claims.  Though

*AroChem* involved a retention of special counsel—*i.e.*, counsel for a particular purpose,

as contrasted to the entirety of the estate's affairs—the Circuit analyzed the issues in

---

[29]     "Hold" and "represent," as used in section 101(14) are not the same thing.  But here there is no contention that Mr. Fox "holds" an interest adverse to the estate.  The only contention has been that he "represented" or may "represent" adverse interests, *i.e.*, those of members of the Molloy-Fox Creditor Group.  And here there are no concerns unique to a class of creditors that would warrant consideration of interests adverse to them that might be separate from interests adverse to the Estate.

[30]     *See AroChem*, 176 F.3d at 626-27 ("given the fact-specific nature of parties' interests and their alignments ... no general rule of simple application ... can be gleaned. Rather, each case must finally turn on its own circumstances, based on a common-sense divination of adversity or commonality.") (internal quotations and citations omitted).

[31]     *See* n.25 *supra*.

terms of the requirements of section 327(a), and the Circuit's analysis of the relevant

considerations is highly relevant here.

As the *AroChem* court noted, approval of the retention of professionals to act for

the trustee is a matter within the discretion of the bankruptcy court,[32] but subject to

restrictions imposed under law.  When evaluating proposed retention, a bankruptcy court

"should exercise its discretionary powers over the approval of professionals in a manner

which takes into account the particular facts and circumstances surrounding each case

and the proposed retention before making a decision."[33]  The *AroChem* court quoted with

approval the Fourth Circuit's ruling in *In re Harold & Williams Dev. Co.*:[34]

> [T]he discretion of the bankruptcy court must be
> exercised in a way that it believes best serves the
> objectives of the bankruptcy system.  Among the
> ultimate considerations for the bankruptcy courts in
> making these decisions must be the protection of the
> interests of the bankruptcy estate and its creditors,
> and the efficient, expeditious, and economical
> resolution of the bankruptcy proceeding.[35]

The *AroChem* court thereafter articulated standards for determining whether a

professional would "hold or represent" an adverse interest under section 327(a).  "To

hold or represent" and adverse interest would be:

> (1)  to possess or assert any economic interest that
> would tend to lessen the value of the bankruptcy
> estate or that would create either an actual or
> potential dispute in which the estate is a rival
> claimant; or (2)  to possess a predisposition under

---

[32]     *AroChem*, 176 F.3d at 621.

[33]     *Id.*, quoting 3 *Collier,* ¶ 327.04[1][a].

[34]     977 F.2d 906, 910 (4th Cir. 1992).

[35]     *AroChem*, 176 F.3d at 621.

14

circumstances that render such a bias against the
estate.[36]

And in that connection, the *AroChem* court noted the importance of distinguishing

between past representation, on the one hand, and present and future representation, on

the other.  It observed that because section 327(a) is phrased in the present tense, counsel

must be disqualified under that section "only if it *presently* 'hold[s] or represent[s] an

interest adverse to the estate,' notwithstanding any interests it may have held or

represented in the past."[37]  The Circuit found it significant that the law firm that the

*AroChem* trustee sought to appoint as its special counsel, having terminated its

representation of the creditor in that case, *no longer* represented interests of that creditor,

and therefore did not 'hold' or 'represent' an interest adverse to the estate.[38]

Also, the *AroChem* court focused, to an extent materially greater than the UST, on

the significance of section 327(c).  It noted that although the prospective counsel's past

representation of the creditor in connection with claims the creditor had filed might mean

that he "represented an interest adverse to the estate" within the meaning of section

327(a), section 327(c) provides that an attorney will not be disqualified based solely on

prior representation of a creditor unless there is an actual conflict...."[39]  Thus, the past

representation of the creditor would not be dispositive by itself, and instead would require

consideration of the existence or nonexistence of an *actual conflict*.

---

[36]     *Id.* at 623.

[37]     *Id.* (emphasis added).

[38]     *Id.*

[39]     *Id.* at 624.

An actual conflict of interest "is 'an active competition between two interests, in which one interest can only be served at the expense of the other.'"[40]

Here there plainly is no conflict or adverse interest with respect to the great bulk of the matters for which Mr. Fox would presumably act as counsel for the trustee—including, most significantly, efforts to uncover secreted assets, and to recover assets, for the benefit of creditors, that may have been sent abroad.  Nor is there a conflict with respect to avoidance actions against creditors other than those in the Molloy-Fox Creditor Group.  Nor, in the most technical sense, would there be a conflict with respect to preference or similar avoidance actions against members of the Molloy-Fox Creditor Group—as Mr. Fox would no longer be representing them, and he did no work with respect to such claims, and received no confidential information with respect to them[41]—though this Court believes that before Mr. Fox investigates or prosecutes any such claims, the Court should at least do a "stop, look and listen," to consider whether they should be investigated or prosecuted, by someone else. [42]  Thus there is no evidence, or indication, that Mr. Fox's representation and his actions on behalf of the Molloy creditors in any way lessened the value of the bankruptcy estate or created an actual or potential dispute with the estate, or would do so in the future—focusing, in particular, on the core

---

[40]    *In re Mercury*, 280 B.R. 35, 54 (Bankr. S.D.N.Y 2002) (Hardin, J.).

[41]    Thus, the Court rejects, as contrary to the evidence, the UST's assertion (UST Br. #1 at 4-5) that "[i]f he [Mr. Fox] represents the Elected Trustee in actions against the creditors who elected the trustee, they may complain that he obtained confidential information during his representation or that he was disloyal to their interests."  No evidence was offered suggesting the receipt of confidential information; Mr. Fox denied it, and the Court found in accordance with Mr. Fox's testimony.

[42]    *See AroChem*, 176 F.3d at 626 ("As an initial matter, [proposed counsel] Caddell no longer represents [creditor and prospective defendant] Wells, so that firm will never be in the position of simultaneously suing and defending Wells….  Moreover, in the unlikely event that the Trustee later chooses to pursue Wells—despite the dearth of record evidence to suggest that such claims exist—Caddell will not represent the Estates, and the Estates will be free to secure separate counsel to press the claims.").

issue as to whether, under the circumstances, Mr. Fox would have a "predisposition" against the estate.[43]

Though the Court heard no evidence suggesting that Mr. Fox would have a predisposition against the estate, it has nevertheless considered other UST arguments. One is that Mr. Fox would have an adverse interest as a consequence of his personal interest in being retained as counsel for the estate, and getting paid for his professional services, and/or as a consequence of making unsatisfactory disclosure to the members of the Molloy-Fox Creditor Group of that possibility. But a professional's getting paid for services, to the extent provided under law,[44] is not an adverse interest. *Every* professional has an economic interest in getting paid for his, her or its work. If securing work for an estate, or getting paid for it, were ever held to constitute an adverse interest, no professional could ever be retained.

Other UST contentions are that Mr. Fox must be disqualified because of his role in the election of the Trustee, and/or the subsequent effort to retain Mr. Fox by the Trustee. These contentions, in turn, break down into subcomponents arguing that Mr. Fox acted improperly in connection with the election under which the Trustee was elected; that it would then be inappropriate for the Trustee to retain Mr. Fox; and/or that Mr. Fox caused the Trustee to be elected with an expectation that he would be retained.

For lack of support in the evidentiary record, or in the law, the Court cannot agree with them. As the UST acknowledges, the election of the Trustee took place in

---

[43]     *See id.* at 623.

[44]     Compensation to duly retained professionals is authorized under sections 328 and 330 of the Code. Compensation is, of course, contingent upon compliance with these and other applicable provisions of the Bankruptcy Code and Rules, and appropriate disclosure. There was no evidence that Mr. Fox would receive payment or other consideration other than as authorized under the Code.

accordance with rights given to creditors under the Code,[45] and in accordance with the

procedures—*e.g.*, Bankruptcy Rule 2006—applicable to elections.  Recognizing the stake

creditors have in the trustee whose diligence may affect their recoveries, the Code gives

creditors the right to select the trustee.  Their vote in favor of Mr. Harrison was

*unanimous*—and thus the Court cannot understand the UST's arguments[46] as to the

significance, if any, of the extent to which any of the creditors so voting might have an

allowed claim, or any advice Mr. Fox gave to members of the Molloy-Fox Creditor

Group as to voting procedures.

By the same token, provisions of the Code *contemplate* that trustees will be

chosen with relationships with creditors, and that professionals will likewise have

relationships with creditors.  Though the Court supposes that it might be possible that

creditors, or some of them, might vote for the selection of a trustee whom they do not

know or have some reason to favor, the Code places no restrictions on whom they may

vote for.  And section 327(c) provides that a prospective trustee's representation of a

creditor is not, by itself, disqualifying.  Similarly, if a trustee is a lawyer, there is nothing

in the Code that prohibits a trustee from hiring himself or herself, or the trustee's law

firm, or a friend or acquaintance as counsel.  In fact, section 327(d) of the Code expressly

permits a trustee to retain himself or herself, or the trustee's law firm, as counsel, and, as

noted above, it is a common practice.  It is also a common practice for chapter 7 trustees

in this district, if not also elsewhere, to hire the same law firms as their counsel over and

over again.  Reasonable people might argue that permitting trustees to hire themselves as

---

[45]      *See* section 702(b).

[46]      *See* UST Br. #2 at 6 ("These voting issues implicate the bifurcation of secured and unsecured
claims, which impact the amount of a claim entitled to vote...").

18

their counsel is bad policy, and/or that trustees should not be permitted to hire their

cronies.  But at the risk of stating the obvious, the Court is not permitted to substitute any

policy preferences it or the UST might have with respect to matters that are in the

Congressional domain.  The Court is constrained to follow the Code and Rules as they

have been written.

With respect to preferences, the Court assumes, without finding, that preference

issues may hereafter exist.[47]  But the Trustee can investigate them, and if need be, he can

secure independent counsel to prosecute them.[48]  For now it is sufficient to note that the

mere possibility that preference claims might be brought against creditors, without more,

is insufficient to warrant denial of the Trustee's choice of counsel.[49]  The UST's

arguments, taken to their logical limit, would apply to *any* case where a creditor's

attorney seeks to represent a trustee.  The UST's contentions ignore the plain language of

section 327(c), which makes disqualification depend on more than the representation of

creditors in the same case.  To disqualify Mr. Fox from representing the Trustee (as

contrasted to requiring the Trustee, in the future, to secure special counsel), the UST must

---

[47]     The UST did not introduce any evidence of arguable preference claims, or even that the interim
trustee sent out preference demand letters, but by the way each of the UST and Mr. Fox addressed
the issue, the Court assumes that preference issues may arise in the future.  In her initial brief, the
UST argued that Mr. Fox "acknowledge[d] that he has not investigated which creditors received
preferential transfer demand letters from the Interim Trustee, so he does not know whether claims
against his former clients exist."  (UST Br. #1 at 2).  She also made some references to preferential
transfers, or analysis of them (UST Br. #2 at 6), though in the context of the election, where,
because the creditor vote was unanimous, they were irrelevant.

Similarly, in his initial affidavit, Mr. Fox stated that "[w]hile certain unspecified Creditors may
have received preference demand letters from the Interim Trustee, none of the Creditors have
discussed this specifically with the attorney herein."  Fox. Aff. of Jan. 30, 2007 at ¶5.

[48]     In dictum, the Court will note that if there had been a one-on-one relationship between Trustee
counsel and a creditor client, the Court would likely require the retention of special counsel, and
would come to a like view if it appeared that confidential information had been received or
imparted.  Under the facts here, in the absence of a one-on-one relationship, the need might not be
as strong, but even then, the Court might well regard such as desirable.  *See Ira Haupt*, n.2 *supra.*

[49]     *See* n.42, *supra.*

demonstrate a present actual conflict with Mr. Fox's prior clients that would result from Mr. Fox's retention.

Similarly, the record suggests that possible consignment claims by certain creditors were discussed, with conclusory observations that such lacked merit.[50]  But there was no evidence that any reclamation claims have yet been asserted, if they ever will be.  If any such claims are asserted, the need to secure special counsel to defend them can be considered then.

The UST further argues that Mr. Fox has a conflict as a consequence of receipt of confidential information from creditors.  However, the Court has found, as facts, that Mr. Fox has never had a one-on-one relationship with any creditor[51] and did not review creditors' books, records or documents.[52]  It has further found that Ms. Molloy did not share any confidential information with Mr. Fox related to her clients[53] and any discussions of consignment and preference issues took place in the presence of third parties[54] (such as the UST) and could not have been confidential.

The UST did not solicit or introduce any testimony or shown that Mr. Fox's representation of Ms. Molloy and her creditor group would have any actual conflict with Mr. Fox's duties in his representation of the trustee.  "[T]he naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but

---

[50]     Fox. Aff. of Jan 30, 2007 at ¶6 ("several of the Creditors alleged a consignment interest in the merchandise.  There is no evidence that any of the $25,000 approximate merchandise belongs to these consignment Creditors.")

[51]     Hrg. Tr. 32.

[52]     Molloy Decl. of Feb. 15, 2007 at ¶4.

[53]     Hrg. Tr. 33.

[54]     *Id.* at 34.

makes it voidable as the facts may warrant."[55]  The general and limited nature of Mr.

Fox's representation of Ms. Molloy and her creditors does not serve as a basis for Mr.

Fox's disqualification under section 327(c).[56]

*C.  Rule 2006(d)(4)*

The UST also argues that Mr. Fox's retention violates the "spirit" of Rule

2006(d)(4), which covers unauthorized solicitations of proxies for the election of the

trustee.  Without asserting any actual violation of Rule 2006(d)(4) itself,[57] the UST

contends that Mr. Fox's retention indirectly achieves the result that election procedures

under the Code are designed to avoid.  She argues that the Court "should exercise its

discretion" to deny employment because "the pattern of Applicant's clients electing a

trustee and then having that same trustee retain the Applicant indirectly fosters the

problems that the election procedure was intended to proscribe."[58]

Rule 2006(d)(4) states that "[t]his rule does not permit solicitation…(4) by or on

behalf of an attorney at law."  Such solicitation is objectionable "because the practice

---

[55]     *AroChem,* 176 F.3d at 627.

[56]     Though this is a discretionary determination, the Court does not believe that it could properly
authorize any retention under circumstances prohibited by the Code, the Bankruptcy Rules, or
relevant caselaw.  Here there are no circumstances that are "show stoppers."  Nevertheless, in a
given case, a court might conclude, as part of an exercise of discretion, that the need to retain
special counsel to deal with future issues known or expected to exist would make retention of two
attorneys impractical.  Under such circumstances, in this Court's view, a court could in the
exercise of discretion decline to appoint an attorney whose potential conflicts would require the
retention of a second counsel.  Here it is conceivable, but not clear, that a second attorney may
have to be retained later in this case.  While that is not, under the Code and caselaw, a basis for
denying retention here, the Trustee should consider whether he believes that the advantages of
securing Mr. Fox's services (such as his familiarity with the asset disappearance issues) trump the
risks of the need to secure special counsel.

[57]     *See* UST Br. #1 at 3 ("A direct violation of this provision is not at issue.  Fox is not the trustee.");
*accord id.* at 4 ("While the provision has not been directly violated, the underlying policy
concerns are evidenced in this case").  The UST acknowledges that Ms. Molloy held the proxies in
this case and that Molloy filed a certification that the proxies had not been solicited. *See id.* at 3-4.

[58]     UST Br. #2 at 2.

carries a substantial risk that administration will fall into the hands of those whose interest is in obtaining fees from the estate rather than securing dividends for creditors."[59]

However, an attorney is not barred from assisting the solicitation efforts of a creditor or committee, so long as it is clear that the attorney is not the solicitor and that the solicitation is not on behalf of the attorney.[60]

The evidence does not support, and indeed contradicts, a conclusion that Mr. Fox went over the line, at least in the context of statutory and rule provisions as they now exist.  The policy arguments advanced by the UST might well be good policy, and if the Court had legislative or rulemaking authority, it might well make changes to address the concerns advanced by the UST.  But judges may not legislate, and are not free to substitute their own notions of appropriate behavior when such amounts to rewriting the actual provisions that have been enacted.

Finally, the UST argues that without directly violating the Rule 2006(d)(4), Mr. Fox has engaged into a pattern of behavior that undermines the "spirit" of the Rule.  The UST contends that in this case and in *Garfinkel*, Mr. Fox advocated the election of Mr. Harrison as a chapter 7 trustee, who then sought to appoint Mr. Fox as his counsel.  This behavior, the UST argues, is even more egregious because it has occurred in two cases:

> [w]hen the same attorney has represented a group of creditors in two cases, the creditors have elected the same trustee, and that elected trustee has sought to employ the same attorney, the appearance is that the elected trustee is beholden to the attorney who represented the creditors electing the trustee and

---

[59]    Advisory Committee Note.

[60]    *See* Collier ¶ 2006.05; see also *In re Eddie Haggar Ltd., Inc.*, 190 B.R. 281, 285 (Bankr. N.D. Tex. 1995).

that the attorney, in turn, is beholden to the electing creditors.[61]

The UST points out that Judge Hardin in *In re Garfinkel* denied Mr. Fox's retention under facts assertedly similar to the facts of this case.[62]

But the Court disagrees that the facts of this case are sufficiently similar to those of *Garfinkel*. In *Garfinkel*, Judge Hardin found that creditors were quite happy with the interim trustee until talking to Mr. Fox, while in this case Mr. Fox was retained by Molloy only after she and/or her creditor group became dissatisfied with the interim trustee. Moreover, but very significantly, in *Garfinkel*, Mr. Fox, who had represented petitioning creditors on whose behalf he filed an involuntary chapter 7 petition,[63] expressed the intention to file administrative expense priority claims under section 503(b) for the reimbursement of those creditors' expenses in connection with the involuntary petition[64]--which of course would have been contrary to the interests of other unsecured creditors. Such claims would have been adverse to the *Garfinkel* estate as a whole, and would have presented an actual conflict for a counsel to the trustee in that case when he evaluated administrative expense claims; no such conflict or adverse interest is present in this case. Finally, in *Garfinkel* Mr. Fox's fee arrangement with his creditor clients provided that Mr. Fox would receive reimbursement of up to $5,000, but the rest of his fee would be paid on contingency basis.[65] Mr. Fox informed his clients that this contingency fee would be waived if he were to become an attorney for the trustee in that

---

[61]     UST Br. #1 at 5.

[62]     UST Br. #2 at 2.

[63]     *Garfinkel* Fox Aff. of Feb. 6, 2007 at ¶4.

[64]     *Id.*

[65]     *Garfinkel* Hrg. Tr. 46, 51.

case.[66]  That, at least arguably, if not also plainly, created an incentive for *Garfinkel*

creditors, who had no prior dissatisfaction with the interim trustee on that case, to elect

Mr. Harrison as a Trustee, who would in turn appoint Mr. Fox counsel.  Here, by

contrast, the UST has made no showing that the creditors electing Mr. Harrison as a

Trustee had any incentive other than maximizing their recoveries and the value of the

Estate.

The Court is not blind to the potential for abuse in this area, or blind to the

possibility that winks and nods not proven by the UST might nevertheless have been

present here.  But the underlying cause of the problem, and of the UST's concerns, is a

statutory scheme that permits trustees to hire themselves or friends of theirs.  The fact

that section 327(d) of the Code allows a trustee to hire himself or his own law firm as

counsel underscores that the Code does not prohibit a professional relationship between a

chapter 7 trustee and the professionals he selects to aid him in the administration of an

estate.  Whether that is good or bad is a matter that Congress must decide.

### D. Appearance of impropriety

Finally, the UST suggests that Mr. Fox's retainer touches upon "the appearance

and the integrity" of the case and submits that the Court should exercise its discretion[67] to

avoid the appearance of impropriety.  Though the UST does not rely on section 105(a),

even after *Marrama*, the Court considers it appropriate to consider whether, with or

without reliance on section 105(a), it should take action here.

But upon considering the matter, the Court believes that it would be inappropriate

to prohibit this retention.  Of course an attorney must avoid "even the appearance of

---

[66]  *Id.*

[67]  Hrg. Tr. 58.

24

professional impropriety."[68]  And once more the Court believes it important to remember,

as Judge Friendly observed, that "[t]he conduct of bankruptcy proceedings not only

should be right but must seem right."[69]  However,

> [b]ecause of the strong countervailing interest in the
> public's right to unfettered choice of an attorney,
> the appearance of impropriety is usually
> insufficient, in and of itself, to support
> disqualification.  A violation of either the duty to
> preserve client confidences or the duty to exercise
> independent judgment on the client's behalf is
> generally also required where disqualification is
> sought…The Second Circuit concurs in the general
> aversion to disqualifications.[70]

The Bankruptcy Code expressly provides that a trustee may employ professionals

to assist the trustee in carrying out his duties under the Code,[71] and the trustee must have

wide latitude in selecting his or her professionals.  "The relationship between attorney

and client is highly confidential, demanding personal faith and confidence in order that

they may work together harmoniously.  Only in the rarest cases should the trustee be

deprived of the privilege of selecting his own counsel ..."[72]

While the Court has the authority to "issue any order, process or judgment that is

necessary or appropriate to carry out the provisions"[73] of the Code, the Second Circuit

has cautioned that the bankruptcy courts are not free to substitute their own notions of

equity for the provisions of the Code, even with the benefit of Bankruptcy Code section

---

[68]   New York Code of Professional Responsibility, Canon 9.

[69]   *See Ira Haupt*, n.2 *supra*.

[70]   *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.*, 53 F. Supp. 2d 338, 345-346
(E.D.N.Y 1999) (Weinstein, J.).

[71]   *See* section 327(a).

[72]   *In re Codesco, Inc.,*  18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982) (Schwartzberg, J.), citing *In re
Mandell*, 69 F.2d 830, 831 (2d Cir. 1934).

[73]   Bankruptcy Code section 105(a).

105(a).[74]  And while the decision in *Marrama,* authorizing the use of section 105(a) under the facts of that case, is of course binding on the lower courts on the issue there decided, four members of the Supreme Court have nevertheless reminded the bench and bar of earlier Supreme Court precedent requiring that section 105(a) not be taken too far.[75]

The UST has not established a violation of any provision of the Code.  The Court does not believe that it can, and in any event will not, deprive a trustee of his right to the counsel of his choice when statutory requirements have been satisfied.

### III.

### Conclusion

The Trustee's application to retain Mr. Fox as a counsel to the trustee is granted. Mr. Fox is to settle an order in accordance with the foregoing at his earliest reasonable convenience.  The time to appeal or move for leave to appeal this decision will of course run from the time of entry of that order, and not from the date of this decision.

Dated: New York, New York              *s/Robert E. Gerber*
      May 1, 2007                        United States Bankruptcy Judge

---

[74]  *See In re Momentum Mfg Corp.*, 25 F.3d 1132, 1136 & n. 4 (2d Cir.1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); *see also In re Aquatic Dev. Group, Inc.*, 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring) ("[T]his Court has repeatedly cautioned that 105(a) "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.' " ") (quoting *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 91 (2d Cir. 2003)).

[75]  *See Marrama*, 127 S.Ct. at 1116 (Alito, J., dissenting) ("a bankruptcy court's general and equitable powers 'must and can only be exercised within the confines of the Bankruptcy Code.'") (citations omitted).